Good morning, Your Honors. May it please the Court. My name is Daniel Lefton. On behalf of Rachel Post, a woman who was appealing the denial of her Social Security disability benefits for an approximate five-year period from 2016 to 2021, while she underwent six separate surgeries, twelve separate procedures to treat diagnosed bilateral carpal tunnel syndrome, median and ulnar nerve entrapment bilaterally, bilateral thoracic outlet syndrome, and recurrent bilateral thoracic outlet syndrome. Your Honors, I want to begin by telling you what I am not doing here today. I'm not here to argue that the ALJ weighed two competing medical opinions and chose the wrong one. As the Commissioner outlined in his brief, there is something called zone of choice. It's precedent in this circuit and we respect it. When two reasonable conclusions can be drawn from the record, this Court defers to the ALJ. Oftentimes, I don't like it, but it is the law and I would not be standing here today using this Court's time if it was just a matter of competing opinions. I'm here because respectfully we submit that there are no competing opinions. Zone of choice presupposes two somethings to choose from. Something on this side and something on this side. But here, this is something versus nothing. And the difference between something and nothing is not a matter of degree, it's a matter of kind. This Court has held that RFC, the residual functional capacity determination, is a medical question. It must be supported by medical evidence of the claimant's ability to function in the workplace. In this case, there are three medical opinions as to functional capacity. You have Drs. Clybur and Dr. Thompson, the treating surgeons, one of whom happens to be the director for the Center of Thoracic Surgery at Washington University here in St. Louis. Both of these physicians, independent of each other, consistently quantified the claimant's lifting limitation at five pounds during this entire five-year period. They gave this opinion 17 times between the two of them over the course of this alleged closed period, each time following a physical evaluation and examination. The third opinion comes from Dr. John Marshall Junk, an eye doctor, who never met Ms. Post, never examined her. He just reviewed a stack of medical records in August of 2017, just a year and a few months following the alleged onset date, and concluded that Ms. Post could lift 10 pounds and required no manipulative limitations at all. As noted by the vocational expert, a five-pound lifting restriction eliminates all competitive employment. A 10-pound lifting restriction does not. So the difference is outcome-determinative. Under Junk, there are jobs. Under Clybur and Thompson, there are not. Therefore, this case comes down to one question. Does Dr. Junk's opinion constitute a qualifying medical opinion? If it does, even a little, I lose. Zone of choice. If it doesn't, then the RFC has no medical foundation and the decision cannot stand. The administrative law judge adopted Junk's 10-pound restriction. She found Junk to be generally persuasive, modifying her previous finding before the first remand in this case from significantly persuasive. Conversely, the ALJ found Dr. Thompson to be unpersuasive. So who is Dr. Junk and how does his opinion hold up against the commissioner's own regulations? What did Dr. Junk rely on? I see the point of this is sort of the pivot point, right? 10 versus 5. And it seemed to me that the ALJ was also relying on some of the other findings of her treating physicians about mobility or grip strength. Is there anything that links those to the weight restriction? I find nothing. I mean, it's a little bit above my pay grade considering it's a medical question. But maybe that's the answer, that it's a medical question and not one for the ALJ? Well, there's certainly no evidence in the entire record that would support a 10-pound lifting restriction. The only medical evidence would be the opinions of the claimants of Ms. Post's treating physicians at a 5-pound lifting restriction. That's the only evidence that even exists in this record that would support a 5-pound, I'm sorry, a 10-pound, I'm sorry, a 5-pound lifting restriction. And did some of those 5-pound lifting restrictions come after the date of Dr. Young's review of the records? 13 of the 17 came after Dr. Young gave his 10-pound lifting restriction. And I think Your Honor, I think that that's actually very important here. Because again, this comes down to the Commissioner's own regulations with regard to how to evaluate medical evidence and opinion evidence. This is essentially a test that goes through four different stages. Supportability, consistency, specialization of the opinion maker, and treatment relationship. So specialization is a factor, but we've never said that it's limited to someone who specializes in a particular injury, right? Correct. It's just a factor. I agree with you that it's a little odd that an eye doctor seems to be the dispositive medical opinion here, but is that contrary to our precedent? Well, if that was the only factor, Your Honor, then yes, I would agree with you. But that's not the only factor. In fact, the main factors are supportability and consistency. And Young fails on each one. He misses on each one. I can explain why, obviously, as far as specialization, he's an eye doctor. We're asking him, or I should say the Commissioner asked him to give an opinion on upper extremity nerve entrapments and thoracic outlet syndrome, brachial plexus impairments. Dr. Thompson, of course, is, like I said, a thoracic surgeon and the head of thoracic outlet syndrome at Washington University. And of course, as far as the treatment relationship goes, as I mentioned, Young never saw her, never examined her, and Drs. Cliver and Thompson saw her consistently. But as far as the supportability and consistency, and Your Honor, I think this is the most important thing here, Young performed his review in August of 2007, just about 14 months after the alleged onset date. He stated that her disability was not expected to reach duration even though it already had. Six weeks after he gave his opinion, Dr. Thompson did a major surgery to remove a rib that was compressing nerves running from her neck through her arm. That was just six weeks after his 10-pound restriction. A year and a half later, he did another major surgery. It was almost four years of treatment that Young did not have an opportunity to look at. Four years he knew nothing about. He said she was going to get better. She didn't. She required four more years of treatment. An opinion, Your Honor, that misses four years of medical care, two major surgeries, just cannot be consistent with the record as a whole. And parenthetically, the judge herself couldn't even accept the incredulous opinion that Young had that she should have no manipulative limitations. And even the parts of the record that he did review, he fumbled. Like I said, he stated that there was no, that she wasn't going to meet duration. It had already met duration. He said that there were no opinions that were more restrictive than his. That wasn't true. He had Dr. Thompson's opinion that said five-pound lifting restriction. He had Dr. Clybur's restriction. Again, those are demonstrably false statements that he made. And again, an RFC opinion that is built on mistaken statements, lack of knowledge of the regulations, mistaken speculation about a recovery that did not happen, and what amounts to a review of only 20 percent of medical records over a five-year closed period cannot be given credence and is simply not supportable. That's why this is a something versus nothing. And that's why the ALJ's RFC opinion collapses. That's why there's no zone of choice. And that's why we believe that this case should be remanded and reversed. And if there are no further questions, I'll reserve the very little time I have left for any rebuttal. Thank you. May it please the Court, Laura Holland for the Commissioner of Social Security. The only issue in this case is whether the ALJ reasonably evaluated Dr. Young's findings in concluding that Post was limited to a range of sedentary work, which is the least physically demanding type of work possible, with reduced reaching, handling, and fingering due to her hand and arm impairments. Post's arguments challenging that assessment amount to a request that the Court reweigh the evidence in a way that's more favorable to her. As the Court recently held in Cropper v. Dudek, the Court's review of this issue is limited to, quote, whether the ALJ adequately analyzed persuasiveness, including the supportability and consistency factors, not whether we agree with the ALJ's evaluation of the record evidence on those issues. Because the ALJ here adequately analyzed the supportability and consistency of Dr. Young's findings, the Court should reject Post's arguments. As to consistency, why doesn't the fact that Post required numerous additional surgeries after Dr. Young's assessment show an inconsistency? Because of a few things, Your Honor. So the state agency medical doctors, they inherently every case review the record early in the time period at issue. They are considered experts under social security disability law under the regulations. And the ALJ is charged with looking at those opinions in light of the record as a whole. So this time lapse is just inherent in the system? Inherent in the system, exactly. And so here, Dr. Young, he recognized that this person, you know, she had had a number of surgeries at the time that he looked at the record in August 2017. He noted specifically, quote, a long prior medical history of hand, wrist, arm, and shoulder allegations was undergoing physical therapy but expected to be able to return to work with some work-related restrictions. But upon remand, he could have done another review, could he not? I understand it's inherent in the process as a general matter. But here we have an initial remand from the district court. Wouldn't that give the ALJ an opportunity to seek an updated agency doctor review? The ALJ could have done that on remand, but the ALJ was not required to do that because the ALJ, there were roughly 1,000 pages of medical records here. The ALJ had all of Dr. Thompson and Dr. Kleiber's findings, their treatment, you know, the entire record was before him. And because of her closed period of disability, the fact that she had gone back to work in 2021 meant that ordering a, you know, consultative examination at that point would have been of limited probative value. And correct me if I'm wrong, but couldn't the ALJ have requested an updated review of the records like Dr. Young did the first time and sort of say go up to just the range of the closed period? Yeah, the ALJ could have requested a medical expert, you know, to look at the records from the, and I don't know why the ALJ didn't here. But I, you know, submit that the ALJ did what she was charged with doing when she looked at the entire record, assessed a very limited RFC for, you know, only sedentary work with up to frequently, or frequently, which is ALJ using her hands and arms. And, you know, I would also point out that the ALJ, in looking at Dr. Young's findings in light of the record as a whole, found that it was inconsistent with the fact that she was reporting to her providers activities that were well outside the realm of what she had testified at the hearing, which that she was basically confined to a recliner during this whole time period. What is the way that Counsel for Ms. Post has presented it, it's sort of, it's the 5-pound weight restriction or the 10-pound. What is the medical evidence that Dr. Young relied on to reach the 10-pound lifting restriction? Yeah, I would just go back to the fact that he, you know, he acknowledged that she had this treatment history, but that the evidence showed that, you know, these surgeries she was having carpal tunnel release, and then she was, and also I think it's important to note that Dr. Thompson and Dr. Kleiber's opinions were not consistent throughout this entire time period. There were so many opinions, they were all over the place. Some said she could lift only 5 pounds, some said she couldn't lift any weight, she couldn't work, some said she could use her left hand occasionally. Were those opinions ones that followed surgeries or were during the course of physical therapy such that that might be expected, or were they statements that were kind of jarring in the context? I mean, I think they reasonably followed her course of treatment, but it's not accurate to say that they were consistently, you know, the same. So the ALJ had to look at all of these 17 opinions. He looked at, or I'm sorry, she looked at, you know, Dr. Young's opinion. And, you know, I would also point out, with regard to Dr. Young's finding, you asked about how it was supported by the evidence. As the ALJ discussed throughout the opinion, he went month by month through all of these surgeries and was noting the findings of Dr. Thompson and Dr. Kleiber after her surgeries. She was noted to have normal arm strength and sensation, 5 of 5 strength, which means full strength, good musculoskeletal motion, grip strength of 30 pounds, extension, full range of motion, extension overhead, only moderate tenderness to touch, but normal hand grip strength. And are those the kinds of findings that are typically then linked to a weight restriction? I would say they are if somebody is exhibiting, you know, full strength in their arms. And it is the most, you know, in terms of the commissioner's definitions of categories of work, it is the most physically demanding, or the least physically demanding type of work possible. Do we have any cases where we look at this where you sort of kind of extrapolate from findings about strength and grip otherwise to determine a weight restriction? Do you I'm not specifically aware of any, but I would just point the court back to the reasonable zone of choice and that the ALJ here looked at the whole record, came to a reasonable conclusion as to what this person's limitations were during this period where she was undoubtedly undergoing, you know, numerous surgeries, but then after each one, doctors were noting, you know, good recovery. And, you know, just to return to her activities, which the ALJ relied on, you know, during this time, she was reporting to providers that she walked her dog, helped clean her nephew's apartment, drove, and she was planning on taking an 11-hour road trip to Pennsylvania. She was, quote, very busy with housework. You know, so those types of things, I would say, are consistent with the ability to lift 10 pounds. Unless your honors have any more questions, I will conclude by returning to the court's recent holdings in Cropper, reiterating that the substantial evidence standard of review directs the court to uphold the ALJ's findings regarding the persuasiveness of medical opinions unless they fall outside of the available zone of choice. Here, they were squarely within the available zone of choice, and so the commissioner respectfully requests that you affirm. Thank you for your time. Thank you. We'll give him a full minute for your rebuttal. Thank you, Your Honor. Your Honors, just with regard to the issues that were brought up, time lapse matters a lot more in a closed period. Ms. Post was in the middle of intensive course of treatment. That's where she was at that period in time 14 months in. The activities that the ALJ referred to in her decision as being normal, I would just refer Your Honors back to my brief and also to Judge White's initial remand, indicating that the ALJ did take those out of context. What this comes down to, Your Honors, is that there was never any point where any medical doctor who ever examined her had a medical finding that resulted in that doctor saying, this woman can lift 10 pounds. She may have had normal grip strength. She may have had normal range of motion. But that five pound lifting restriction was put there the entire time, which, Your Honor, I think speaks to what you're saying is that there really is no correlation. And with that, Your Honor, I thank you. Thank you. Thank you. Thank you to both counsel for your arguments here today and the briefing. We'll take the matter under advisement.